# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  9:14-CV-80667-ROSENBERG/BRANNON

FAIR HOUSING CENTER OF THE
GREATER PALM BEACHES, INC.,
et al.,

   Plaintiffs,

v.

SONOMA BAY COMMUNITY
HOMEOWNERS ASSOCIATION, INC.,
et al.,

   Defendants.

_____/

## OMNIBUS ORDER ON POST-TRIAL MOTIONS

This matter is before the Court on Plaintiff The Fair Housing Center of the Greater Palm Beach's (the "Center") Motion for New Trial Limited to Diversion of Resources and Frustration of Mission [DE 460], the Center's Memorandum in Support of Injunctive Relief [DE 457], the Center's Motion for Judgment as a Matter of Law as to Property Managers [DE 461], and Defendant Emanuel Management Service's Motion for Judgment [DE 459].  Each motion has been fully briefed.  The Court has reviewed the documents in the case file and is fully advised in the premises.  After a review of the facts of this case, each motion is addressed in turn.

## I.  INTRODUCTION

Plaintiffs initiated this suit by alleging discrimination on the basis of familial status in the rental of housing in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Florida Fair Housing Act, Fla. Stat. § 760.20 *et seq.*  The Plaintiffs are the Center and a number of current and former residents of the Sonoma Bay and Marsh Harbour condominium developments,

both of which are located in Riviera Beach, Florida and are Defendants in this case.

In their Second Amended Complaint, Plaintiffs alleged violations of three provisions of the federal Fair Housing Act and three nearly identical provisions of the Florida Fair Housing Act.[1] *See* DE 93.  Specifically, Plaintiffs alleged that Defendants' policies and practices constituted discrimination against families with children in violation of these statutory provisions.  *See* DE 93.

The following facts are undisputed in this case: beginning sometime in 2010 or later, rental applications for both the Sonoma Bay and Marsh Harbour condominium developments included a requirement that prospective tenants provide copies of report cards for persons under the age of 18 (the "Report Card Requirement").  Beginning sometime in 2010 or later, the Rules and Regulations for both the Sonoma Bay and Marsh Harbour condominium developments required (1) that all residents wear proper attire when walking on the streets of the development, no boys should be shirtless, and girls must wear a cover up over a bathing suit when walking to the pool (the "Proper Attire Rule"), (2) that there would be no loitering—congregating on the streets of the development—at any time (the "Loitering Rule"), and (3) that persons under the age of 18 must be in their home or on their patio after sunset (the "Curfew Rule").[2]

In addition to monetary damages and other forms of relief, Plaintiffs requested entry of a declaratory judgment finding that Defendants are in violation of the federal Fair Housing Act and

---

[1] "Florida's Fair Housing Act is the state counterpart to the Federal Fair Housing Act Amendments.  The FFHA is patterned after the FHA and courts have recognized that it is to be construed consistently with federal law." *Milsap v. Cornerstone Residential Mgmt., Inc.*, No. 05-60033-CIV-JOHNSON, 2010 WL 427436, at *2 (S.D. Fla. Feb. 1, 2010) (citing *Dornbach v. Holley,* 854 So. 2d 211, 213 (Fla. Dist. Ct. App. 2002); *Loren v. Sasser,* 309 F.3d 1296, 1300 n.9 (11th Cir. 2002)).

[2] Although the parties disputed whether a written Curfew Rule was ever in effect for residents of the Sonoma Bay condominium development, the Court notes that the Rules and Regulations applicable to residents of Marsh Harbour included, under the heading "Curfew," an explicit statement that "[a]ll persons under the age of 18 must be in their home or back patio after sunset," in addition to a more general statement, under the heading "Loitering," that "[a]fter dark all children should be in their home or on their patio."  The Rules and Regulations applicable to residents of Sonoma Bay, however, included only the general statement, under the heading "Loitering," that "[a]fter dark all children should be in their home or on their patio."

the Florida Fair Housing Act; entry of an Order requiring each Defendant to take appropriate actions to ensure that the activities complained of are completely stopped immediately and not engaged in again by it or any of its agents; and entry of a permanent injunction directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described in Plaintiffs' Second Amended Complaint, including but not limited to prominent notice to all tenants and homeowners correcting any and all related unlawful provisions in their leases and ownership documents, and to prevent similar occurrences in the future.[3]  *See* DE 93 at 27-28.

A jury trial was conducted on Plaintiffs' claims between October 14, 2015 and October 15, 2015, and between October 19, 2015 and October 23, 2015.  The jury entered a verdict wholly absolving Defendants from liability and awarded Plaintiffs no damages.

## II.  ANALYSIS AND DISCUSSION

Presently before the Court is the Center's Motion for New Trial Limited to Diversion of Resources and Frustration of Mission, the Center's Memorandum in Support of Injunctive Relief, the Center's Motion for Judgment as a Matter of Law as to Property Managers, and Defendant Emanuel Management Service's Motion for Judgment.

On October 1, 2015, the Court entered an order on Plaintiffs' Motion for Partial Summary Judgment.  DE 358.  In that order, the Court held that only a trier of fact could determine whether Defendants' Report Card Requirement and Proper Attire Rule violated the Fair Housing Act.  *Id.*

---

[3] In a civil action brought pursuant to the federal Fair Housing Act, the Court may grant as relief "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)" upon finding that a discriminatory housing practice has occurred or is about to occur.  *See* 42 U.S.C. § 3613(c).  Similarly, in a civil action brought pursuant to the Florida Fair Housing Act, the Court "shall issue an order prohibiting the practice and providing affirmative relief from the effects of the practice, including injunctive and other equitable relief . . . ." *See* Fla. Stat. § 760.35(2).

The Court did find, however, that the text of the Curfew Rule and the Loitering Rule violated the Fair Housing Act. *Id.* Notwithstanding the Court's conclusion that the text of those rules violated the Fair Housing Act, the Court left the ultimate determination of liability and damages to the trier of fact. *Id.* The Court's decision on this matter is the impetus for many of the motions presently pending before the Court and, as a result, the Court reviews its decision in greater detail in Section (A), *infra.* Following this review the Court considers: (B) the Center's Motion for a New Trial, (C) the Center's Memorandum in Support of Injunctive Relief, (D) the Center's Motion for Judgment as a Matter of Law, and (E) Emmanuel Management's Motion for Judgment.

## A.  The Court's Order at Summary Judgment

At trial, the Center argued that the Court's prior rulings at summary judgment established that the Center was entitled to damages (with respect to two of the rules at issue in this case) and that the jury's role was to determine the amount of those damages. The Center misconstrued the Court's rulings. While the Court had previously held that the text of certain rules, the Loitering Rule and the Curfew Rule, did violate the FHA, this violation is not equivalent to a finding of liability under the FHA.

The Center's position and apparent confusion in this matter stems from a certain disconnect in its motion for partial summary judgment. While the argument in the Center's motion focused on whether the text of Defendants' rules violated the FHA,[4] the Center's prayer for relief

---

4 The Court's order was directed to the substance of the Center's motion for partial summary judgment, which was a request, by the Center, for the Court to determine whether the text of certain rules violated the FHA. The Court's treatment of the motion in this manner was made manifest by virtue of the fact that the entirety of the Court's analysis focused on the text of the rules at issue and not on facts in evidence pertaining to Defendants' use, application, or enforcement of those rules—all of which are issues that go to liability. Only a single sentence in the Court's order could arguably be construed as pertaining to Defendants' application of the rules: "Although Defendants have provided evidence that the Loitering Rule and Curfew Rule were not enforced, this evidence goes to damages and not to liability." DE 358 at 11. This sentence did not signal that Defendants were liable—as reiterated by the Court at trial. Instead, this sentence (when properly viewed in context) merely disregarded Defendants' arguments as

sought a determination of liability.  The disconnect, then, was causation.  Implicit in the Center's reasoning was (i) if a rule violates the FHA, and (ii) that rule was published by a Defendant, then (iii) the publishing Defendant is liable to a fair housing center.  Not so.  The statute governing remedies under the FHA[5] merely states that certain remedies "may" flow from a violation and, moreover, case law establishes (as detailed below) that the existence of a rule that violates the FHA is not, by itself and without more, sufficient to impose liability.

While there were no disputed material facts at summary judgment as to whether Defendants' rules were published, there was a dispute of material fact as to what impact those rules had on Plaintiffs and on the community as a whole.[6]  Indeed, Defendants' enforcement of the rules was a hotly and vigorously contested issue that resulted in extensive testimony at trial.  The impact of Defendants' rules on the community was a hotly contested issue also.  To the extent the Center takes the position that, independent of any dispute of material fact pertaining to causation, the existence of certain rules caused it damages as a matter of law at summary judgment, or, alternatively, that the Center was not required to prove causation at summary judgment, these positions contravene the law.

In *Martin v. Palm Beach Atlantic Association, Inc.*, 696 So. 2d 919, 921 (Fla. Dist. Ct. App. 1997), an apartment complex maintained a rule that prohibited occupancy of any child under the age of twelve.  The defendant in that case argued that the rule was not enforced.  *Id.*  Like the instant case, the trial court in *Martin* concluded at summary judgment that the text of the rule

---

inapplicable in the context of whether or not the Loitering Rule and Curfew Rule—in the abstract—violated the FHA. The Court's ruling was very narrow and was limited to the text of the rules and not to a finding of liability.
5 42 U.S.C. § 3613(c)(1).
6 While Defendants' statement of material facts in opposition to the Center's motion for partial summary judgment was certainly not a model of clarity and arguably was procedurally improper, the Court did not deem any of Plaintiffs' material facts admitted.

violated the FHA. *Id.* at 922. In light of the defendant's defense of non-enforcement, the appellate

court in *Martin* held that such a defense could be considered by a jury on the issue of damages and

the issue of causation:

> The rules of appellee condominium prohibiting children are discriminatory on their face under the "familial status" section of the FHA. Their publication is a statutory violation. In the instant case, the association may not have enforced the restrictions in question, but it neither took steps to remove the offending restrictions prior to appellant's occupancy nor communicated their unenforceability to appellant. On the other hand, appellee's contention that it did not demonstrate an *intent* to discriminate may be considered by the jury as to the issues of damages and their causation.

*Id.* at 922-23. Thus, the mere fact that the rule in *Martin* violated the FHA was insufficient to

establish liability—causation remained in question. *Id.*

Similarly, in *Blomgren v. Ogle*, 850 F. Supp. 1427, 1430 (E.D. Wash. 1993), an apartment

maintained a rule that prohibited occupancy by children. The defendant argued the rule was not

enforced. *Id.* On summary judgment, the *Blomgren* court held that while the rule discriminated on

its face, damages "may be imposed only where there is credible proof of harm proximately caused

by the violation" and a "convincing non-discriminatory motive will be relevant for consideration

by the factfinder as to Plaintiff's damages, if any, and causation." *Id.* at 144-41. As in *Martin*,

evidence of enforcement was relevant to causation.

The Court's ruling in the instant case at summary judgment resembles the rulings of the

trial courts in *Martin* and *Blomgren*. While the text of the Loitering Rule and the Curfew Rule in

the instant case patently discriminated against children, the application and enforcement of those

rules were left to the jury to determine causation and damages and, as a result, the jury—not the

Court—determined Defendants' liability. This was true not only for the individual Plaintiffs, who

needed to prove a Defendant's discriminatory actions caused damages, but also for the Center,

which needed to prove that a Defendant's actions caused the Center to divert resources to remedy damage to the community or to otherwise respond to a Defendant's discriminatory actions. It was for the jury to decide, then, whether any Defendant caused any damages, including any damages to the community. If the community at large was not impacted in any way by any Defendant, there could be no diversion of resources traceable to any Defendant for which the Center could seek recompense.

None of the foregoing should come as any surprise to the Center as shown by the exchange between the Court and counsel at trial:

> *Mr. Postman:* [referring to a proposed verdict form] If you look at question one, you haven't found us liable.[7] Liable suggests that there is damages to be awarded. I don't think Your Honor found any damages should be awarded or proven to be awarded or suggesting that damages should be awarded. I think the word liable would suggest to this jury that Your Honor is basically telling them to award damages.

> *The Court:* Just one moment. It probably is a more accurate statement to say the Court has previously found that -- the formal title of the rules and regulations that relate to the curfew rule and loitering rule -- violate the Fair Housing Act.

DE 476 at 193. Immediately thereafter **the Center accepted the Court's summary of its prior ruling** and how that ruling should be reflected on the verdict form:

> *Mr. Mehri:* We are comfortable with what you said.

> . . .

> Our preference would be the liable language, that is what was done in the district, but we'll accept the language you propose.

*Id.* at 194.   In accordance with the Court's ruling and the Center's consent, the verdict form submitted to the jury read as follows:

---

7 A prior version of the verdict form stated that the Court had previously found the Defendants to be liable. *See* DE 476 at 170.

The Court has found that the language of the Loitering section of the Sonoma Bay Rules and Regulations violates the Fair Housing Act.  Do you find that the Defendant Sonoma Bay Community Homeowners Association, Inc. is liable to Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. for that violation and/or any other violations of the Fair Housing Act?

DE 438 at 1.[8]

The Center consented to the manner in which the jury was instructed on the verdict form. The Court turns next to the motions pending before the Court.

### B.  The Center's Motion for New Trial

The Center has moved for a new trial.  A court may grant a new trial "on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  A court has the power to require a new trial on even a single issue.  *See* 1 Wright, Miller and Kane, FEDERAL PRACTICE AND PROCEDURE § 2814, pages 197-201.  When ruling on a motion for a new trial, a trial judge must determine "if in his [or her] opinion, the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice."  *Ins. Co. of N.A. v. Valente*, 933 F.2d 921, 923 (11th Cir. 1991) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)).  In ruling on a motion brought under Rule 59(a), the "trial judge must protect against manifest injustice in the jury's verdict." *Hewitt*, 732 F.2d at 1559.  "The decision whether to grant a new trial is discretionary with the district court will not be reversed absent an abuse of that discretion." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1486 (11th Cir. Fla. 1983) (affirming partial grant of new trial on certain liability issues and damages).

---

8 For the sake of simplicity and brevity, the Court's citations and quotations are sometimes confined to a single rule in lieu of every rule.

The Center argues that a new trial is warranted because (1) the jury's verdict in this case is against the weight of the evidence and is contradictory to the Court's prior rulings, (2) counsel for the defense made erroneous statements in front of the jury regarding the jury's role, (3) Defendants re-litigated an issue already decided by this Court on summary judgment, and thereby confused the jury, and (4) Defendants' objections at trial deprived the jury of material facts necessary to make an informed decision. Each point is addressed in turn.

### 1. Whether the Jury's Verdict was against the Weight of the Evidence and was Contradictory to the Court's Prior Rulings

The Center sought damages at trial for diversion of resources and frustration of mission. An organization such as the Center is entitled to receive damages for a violation of the FHA when such a violation has caused damages in the form of diverted resources to combat the violation. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1988). For example, counseling expenses may be sought by the Center if those expenses resulted from Defendants' improper actions under the FHA. *Id.* The Center argues that because this Court concluded that some of the rules in this case violated the FHA, and because the evidence at trial established that those rules were enforced, the Center is entitled to damages. Stated another way, the Center essentially argues that while the individual Plaintiffs in this case may not have been entitled to damages (as those Plaintiffs were required to trace their individualized damages to Defendants' actions), the Center need only trace its damages to the existence of an improper, enforced policy.

The Center proceeds on an improper premise. To the extent the Center argues that the evidence at trial unequivocally established that those rules were enforced in a discriminatory manner, the Court does not agree. Furthermore, the Center's argument ignores a critical issue—the need for the Center to establish causation *between FHA violations and its own*

9

*damages*.  In *Equal Rights Center v. Post Properties, Inc.* 633 F.3d 1136, 1140 (D.C. Cir. 2011), the circuit court considered the necessary elements for a fair housing center to obtain damages. The court stated:

> Instead of focusing entirely on the voluntariness of the [fair housing center's] diversion of resources, therefore, the district court should have asked, first, whether [the defendant's] alleged discriminatory conduct injured the [fair housing center's] interest in promoting fair housing and, second, whether the [fair housing center] used its resources to counteract that harm.

*Id.*  Here, the logical mode of inquiry to determine whether Defendants' "alleged discriminatory conduct injured" the Center is to first examine the jury's verdicts as to all Defendants.  The jury absolved all Defendants of all liability.  No Defendant was found to be liable under the FHA.  No Defendant was found to owe damages to any Plaintiff.  Thus, there was no violation of the FHA that could have injured the FHA's interest in promoting fair housing.

The Center appears to have anticipated this obstacle to their sought-after relief.  The Center's arguments on this point could be construed as follows: While the jury may have found that there were no FHA violations as to the *other* Plaintiffs in this case, there could have existed unnamed Plaintiffs or unknown persons who suffered from the enforcement of improper policies and the Center should be compensated for diverting its resources to remedy *that* discrimination. Alternatively, the Center appears to argue that regardless of any lack of damage to a specific individual, the Center itself incurred damages due to the publication, existence, or enforcement of the Loitering Rule and the Curfew Rule.  The Center assumes too much, and, moreover, disregards the jury's verdict.  *Contra United States v. Siegelman*, 640 F.3d 1159, 1164 (11th Cir. 2011) (noting that a jury's verdict is entitled to respect).

With respect to the Loitering Rule and the Curfew Rule, the jury could have lawfully awarded no damages to the Center if the jury found Defendants did not cause any damages to the Center in connection with those rules.  *See Blomgren v. Ogle*, 850 F. Supp. 1427, 1430 (E.D. Wash. 1993).   In other words, the jury could have concluded that the facially discriminatory Loitering Rule and Curfew Rule did not cause damages through any Defendant's actions.  If those rules did not cause damages through any Defendant, there was no discrimination for the Center to remedy through counseling services and the like.  Alternatively, the jury could have concluded that those rules neither caused damages through any Defendant nor caused damages (to the Center) through the mere publication or existence of the rules.  Finally, the jury could have concluded that while the Center did incur costs associated with remedying perceived discrimination, those costs were derived from the Center's efforts in connection with the Report Card Requirement or the Proper Attire Rule; the jury—not the Court—determined the legality of the text of those rules.[9] Because the jury found no liability in connection with the Report Card Requirement or the Proper Attire Rule, if the jury likewise concluded that the Center's costs stemmed from its actions in response to those rules, the Center would be entitled to no damages.  In summary, the jury was properly instructed, "[Y]ou should determine what amount, if any, has been proven by [the Center] by a preponderance of the evidence as full, just and reasonable compensation for all of this Plaintiff's damages as a result of each Defendants' discriminatory acts," and the jury had adequate evidence upon which to lawfully reach its decision.  DE 433 at 13.

It was within the jury's purview to conclude that there were no discriminatory acts sufficient to cause the Center any damages or, at a minimum, to conclude that the Center did not meet its burden to establish such.  *Equal Rights Center*, 633 F.3d at 1140.  The Defendants in this

---

[9] The Center does appear to challenge the jury's verdict as to the Report Card Requirement or Proper Attire Rule.

case were accused of discrimination against children.  Notwithstanding this serious allegation, approximately eighty percent of the families residing in Defendants' complexes had children.  DE 474 at 173.  The Center emphasizes that this evidence means many families experienced discrimination.  That is one interpretation.  Another plausible inference from this evidence is that many families chose to live there, chose to stay.  Families renewed their leases.  An extremely small percentage of families residing at the Defendant communities chose to join this lawsuit. Evidence was introduced that the controversial rules were intended to be used to *benefit* children.[10] Evidence was introduced that rules were applied uniformly to all residents—not just children:

> Q.      Security has approached your husband and your adult children, correct?
>
> A.      [Brenda Bluntson] Correct.
>
> Q.      This is the incident where they were loitering outside the house?
>
> A.      They were standing outside in front of the house.
>
> Q.      Your husband is an adult?
>
> A.      Yes, he is.
>
> Q.      And your children are adults?
>
> A.      Yes.
>
> Q.      It didn't involve your adult children?
>
> A.      They were the same time, the grandchildren had to go in the back, and they had to come in the house.
>
> Q.      This was addressed to everybody?
>
> A.      The security was addressing the grandchildren definitely, they couldn't play out front where we were trying to play, and adults, you can't stand out. Again, I mean I thought we could enjoy the community.

---

10 For example, evidence was introduced that the Report Card Requirement had some relation to the provision of tutoring services to children.

12

Q.      Wasn't there one time your husband and boys were outside, the children, children, not your grandchildren, correct?

A.      Yes.

Q.      And they were sitting on a car, correct?

A.      Uh-hum.

Q.      Laughing and carrying on, correct?

A.      Yes.

Q.      And security told them that they had to go inside or go in the back, correct?

A.      Correct.

Q.      And that is your children, children not your grandchildren?

A.      That is my children, children.

Q.      All adults?

A.      All adults, correct.

DE 474 at 217-18.  Evidence was admitted that the Curfew Rule was intended to be a safety

measure without any connection to the Loitering Rule whatsoever:

Q. Are you saying, then, that there were -- this rule, the loitering rule included playing ball and other activities in the street, that is a subtle way of letting drug dealers know they shouldn't be out there?

A. [Jeanne Kulick] It was the possibility of suspicious activity going on, not only drug dealing, but other suspicious activity as well.

Q. After dark all children should be in their home or patio. Is that for people dealing in drug dealing or suspicious activity?

A. No. That sentence is a misunderstanding as far as being related to the sentence above it. After dark all children should be in the home or on their patio stems from the fact after dark the streets were very dangerous because of cars speeding down the street and the children were small and they -- adults did not want -- driving cars

13

did not want to hit them. That is where it came from. The fact that it is in with this paragraph is probably wrong and incorrect, it should have been somewhere else.

. . .

Q. I think your testimony was that this was -- let me ask you this: In terms of having children go in after dark, you did include children who were 17, 16, 15, that age range, correct?

A. No. That statement I said before in my cross, I said that that statement probably should never have been there because it should have been under safety, or in some other area. It certainly should not be with loitering.

DE 476 at 116-17, 128.  Alternatively, evidence was introduced that questioned whether certain rules were enforced at all:

Q.     And what sort of activities did you see children playing in the community?

A.     [Niambi Emanuel] Tennis, basketball, kick ball, tag.

Q.     Did you ever tell the children playing in the community that they could not play outside?

A.     No.

Q.     Did you ever tell the children playing in the community that they had to go inside?

A.     No.

Q.     Did you ever personally enforce the curfew policy?

A.     No. Not really.

*Id.* at 173.  Finally, evidence was introduced that questioned the motives of the Center in bringing this suit and the methodology it used to compute its damages:

Q.     There are a couple of entries there, there are two, correct?

A.     [Bobbie Fletcher] Yes.

Q.     And they both say pretrial hearing, correct?

14

A.      Yes.

Q.      And the first entry says 8:30 a.m. to 7:15 p.m., ten hours and 45 minutes?

A.      Yes.

Q.      And a second entry immediately below that for the same date from 8:50 a.m. to 7:15 p.m., for ten hours and 25 minutes?

A.      Right.

Q.      Do you know what that hearing was about that day?

A.      I don't, I can't recall.

Q.      Do you know how long the hearing was?

A.      Well, again, ten hours and 25 minutes.

Q.      Are you aware the hearing was approximately three and a half hours of court time?

A.      Well, it wouldn't just include court time.

Q.      Okay.  So, your position is that it is reasonable to bill over 21 hours for a three and a half hour hearing in which attorneys attended; is that correct?

A.      That is for myself and Mr. Larkins, I put two down there.  Yes, those numbers are correct.

Q.      Did you do anything during that hearing?

A.      Did I do anything? I can't remember.

Q.      Did you –

A.      I don't have a clue, sorry. I can't remember.

. . .

Q.      Did you provide any testimony during that hearing?

A.      I can't remember.

15

Q.      Did you have to prepare for testimony?

A.      I can't remember.

Q.      Did Mr. Larkins have to prepare for testimony?

A.      I'm sorry, I would have to refer to the depositions.

Q.      Okay.  But your position is 21 hours worth of time would be a reasonable bill for that?

A.      Absolutely, absolutely.

DE 473 at 56-58 (discussing the Center's bill for 21 hours of time at $275 per hour).  The jury was entitled, if it so chose, to assign no credibility to the Center's testimony on causation and damages. *See* discussion on *Shutters Condominium Association*, *infra*.

In rejecting the Center's arguments that the individual Defendants in this case were liable, it was within the jury's purview to reject the argument that other, unnamed plaintiff-residents were damaged by virtue of the rules at issue, that damages accrued to the Center from the mere existence or publication of the rules alone, or that Defendants caused damages to the Center's mission in any way.  Finally, the Center consistently misrepresents the applicable standard in arguing this matter to the Court.  *See, e.g.*, DE 460 at 7.  The applicable standard is not whether the jury's verdict was against the weight of the evidence, as the Center repeatedly argues, nor is the correct standard whether the jury's verdict was against the greater weight of the evidence.  The correct standard is that the jury's verdict cannot be against the great weight of the evidence or against the clear weight of the evidence.  *See Ins. Co. of N.A. v. Valente*, 933 F.2d 921, 922-32 (11th Cir. 1991).  The jury's verdict was not against the great or clear weight of the evidence.

This is not the first time the Center has argued that a jury's decision to award no damages was not supported by the evidence.  In *Fair Housing Center of the Greater Palm Beaches, Inc. v. The Shutters Condominium Association, Inc.*, 389 F. App'x 952, 955-56 (11th Cir. 2010), the Center made the same argument.[11]  The Eleventh Circuit rejected this contention, stating: "We cannot conclude as a matter of law that there is no evidence to support the jury's verdict.  The jury may have concluded that the [Center] failed to establish a causal connection between its alleged damages and the [discriminatory activity]. . . .  Furthermore, the jury may not have found [the Center's testimony] credible."  *Id.*  Similarly, in the instant case the jury found no Defendant to be liable and in *Shutters* the evidence "did not support the complaint of the [Center] that the [discriminatory activity] 'interfered with the rights of the [Center] and frustrated the [Center's] mission.'"  *Id.* at 956.

The Center relies heavily upon the case of *Miami Valley Fair Housing Center, Inc. v. The Connor Group*, No. 3:10-cv-83, 2015 U.S. Dist. LEXIS 95180, at *10 (S.D. Oh. July 21, 2015), but that case is of no benefit to the Center.  The *Miami Valley* court noted that "damages are not recoverable in court until the fair housing organization *actually proved that the defendant* has violated the fair housing laws.  *Once it establishes liability*, a fair housing organization is entitled to recover damages for the diversion of resources and frustration of mission directly and proximately caused by the defendant's discriminatory conduct."  *Id.* (emphasis added).  Again, the Court's decision at summary judgment in the instant case did not establish liability.  That question was left to the jury.  The jury found no Defendant to be liable.  By contrast, liability in *Miami*

---

11 Because the Center was awarded zero damages for diversion of resources by a jury in a prior case, the Center appealed that verdict, and the verdict was affirmed by the Eleventh Circuit, the Center has no valid legal basis upon which to argue, as it has, that the jury's verdict in the instant case was "a radical departure from legal precedent."  DE 460 at 3*; Shutters*, 389 F. App'x at 955-56.

*Valley* did not turn on a defendant's enforcement or application of a rule.[12]  Instead, in *Miami Valley* the discriminatory activity was an advertisement published to the world.  *Id.* at *1 ("The ad stated that 'our one bedroom apartments are a great bachelor pad for any single man looking to hook up.'").  There was no question in *Miami Valley* pertaining to the enforcement of a rule or policy that altered the conditions of residence.  Stated another way, there is an evidentiary difference between *Miami Valley*, where an advertisement arguably limited who should apply for a residence, and the instant case, where a rule facially limited mobility at night.  Viewing the argument the Center now makes through the lens of trial, the burden was on the Center to prove that the mere existence or publication of the Loitering Rule and the Curfew Rule caused it damages.  The jury rejected the Center's contention—the Center did not meet its burden.

To be clear, the Center certainly submitted substantial evidence of its *expenses*.  A fair housing center is entitled to expend resources rectifying what it perceives to be discrimination, but in the event that perception is incorrect—residents are not affected by discrimination—a fair housing center is not entitled to damages; damages must originate from programs designed to counteract the effects of an injury-in-fact that is in turn traceable to a defendant's conduct.[13]  *Equal Rights Center*, 633 F.3d at 1140.  The jury found no injuries-in-fact in this case.  The jury found no fault with any Defendant's conduct.  The jury's verdict is entitled to respect.

---

12 There is also more limited information in *Miami Valley* compared to the instant case.  A review of the docket in *Miami Valley* suggests that the only plaintiff in that case was the fair housing center.  There could be no finding, then, by the jury in *Miami Valley* as to any individual plaintiffs.  By contrast, the jury in this case found no Defendant to be liable and found no individual Plaintiff to be entitled to damages—a finding missing from the verdict form in *Miami Valley*.  Furthermore, the damages in *Miami Valley* were traceable in some form to the publication of an advertisement.  The Court is unpersuaded that in the instant case the Center, with the burden of proof and which the jury could choose to disbelieve, proved—by the great weight of the evidence—that its damages stemmed from the *mere publication* of the Loitering Rule and Curfew Rule, such that this Court must order a new trial.
13 In light of the jury's verdict and the evidence in this case, the Court declines to award nominal damages.  *See Jeffrey O. v. Boca Raton*, 511 F. Supp. 2d 1339, 1361 (S.D. Fla. 2007).

### 2.   Whether the Jury was Confused Regarding the Calculation of Damages

The Center argues that the jury was confused as to its role in calculating diversion of resource damages and frustration of mission damages.  As an initial matter, the Court rejects this argument for the reasons set forth above—the jury was entitled to (and did) conclude that the Center was entitled to no damages at all.  Such a finding precludes the need to calculate damages. The Center's argument is premised on the following exchange in the presence of the jury:

> *Mr. Mehri*: With the Court's permission, I would like to offer Mr. Kleina as an expert in this case on Fair Housing Centers, their missions and purpose, reasonable efforts by Fair Housing Centers and the areas of diversion of resources and frustration of mission.

> *The Court*: Any objection other than what is of record?

> *Mr. Postman*: With regard to -- yes, Your Honor, with regard to this witness articulating how he thinks damages should calculated. In all fairness, *that is your determination*.

DE 473 at 100 (emphasis added).  With respect to defense counsel's utterance of an incorrect four-word phrase during the course of a six-day trial, the jury was clearly instructed as to its role in calculating damages, DE 433 at 13, and the verdict form made this clear as well.  DE 438.

### 3.   Whether Defendants Re-litigated an Issue Decided by this Court and Thereby Confused the Jury

The Center argues the following question by the defense confused the jury:

> *Mr. Postman*: You would agree with me that the purpose, your understanding -- I am not asking for legal conclusions, but as the individual in charge of enforcement, the Plaintiff organization, that if somebody -- everybody is treated the same, if there are a lot of rules, but it applies to everybody that wouldn't be discrimination, correct, in your opinion?

> *Mr: Mehri*: Objection.  I feel he is asking her a legal question, she is a lay witness.

> *The Court*: Overruled.

19

> *Mr. Postman*: Do you understand my question?
>
> *Bobbie Fletcher*:  Well, if I may, I think I will keep to why we filed the lawsuit.  It was in reference to the documents that -- the fact of the rules and regulations that were implicit to children under 18.

DE 476 at 20-21.  The Center argues that this question confused the jury because it implied to the jury that it could determine whether the Curfew Rule and the Loitering Rule violated the FHA.  As an initial matter, the Court does not agree with the FHA's characterization of this exchange insofar as while the Court concluded at summary judgment that the text of those rules violated the FHA, the enforcement of those rules—particularly if the rules were enforced uniformly as to all residents—was absolutely pertinent to the jury's decision on damages and, by extension, liability. In any event, the jury was clearly informed on the verdict form of the Court's prior rulings: "The Court has found that the language of the Loitering section of the Sonoma Bay Rules and Regulation violated the Fair Housing Act."  DE 438.  There was no juror confusion.

### 4.   Whether Defendants' Sustained Objections Deprived the Jury of Material Facts

The Center argues that the jury was not informed, over objection, of the Court's prior ruling as to the Loitering Rule and the Curfew Rule.  This is wrong.  The jury was informed: "The Court has found that the language of the Loitering section of the Sonoma Bay Rules and Regulation violated the Fair Housing Act."   DE 438.  The Center argues that this information should have been conveyed to the jury before the jury heard testimony from certain witnesses because then the jury would have known "that the Center succeeded in prosecuting claims regarding the Curfew and Loitering Rules at two locations, benefitting hundreds of families with children."  DE 460 at 16.  This is wrong.  The Center did not "successfully prosecute claims" because the Court's ruling at summary judgment did not establish liability or damages.  As for

whether the Center's efforts at summary judgment benefited anyone, this is a matter of subjective belief.  To the extent such a thing could be objectively determined, it would be by the jury—which rejected the Center's claims.

Finally, the Center argues that the jury was confused as to the statute of limitations affirmative defense raised by Defendants in this case because the instruction contained no discussion of the continuing violation doctrine.  The Court expressly ruled on this matter at trial:

> *The Court*: The instruction, page 15, Statute of Limitations, the Court is going to keep it as it is. The Court is going to overrule or not accept the request from Plaintiff there be some language regarding continuing violation, per the City of Miami case.
>
> The Court understands the violation doctrine, and it believes to get into that instruction would be confusing and could unduly mislead the jury and there is ample evidence from which the Plaintiff can argue what occurred during the requisite Statute of Limitations period that it doesn't require to risk confusing the jury with the continuing violation type instruction.

DE 476 at 186.  The Court's decision on this matter remains unchanged.  The Center's Motion for a New Trial is **DENIED**.

### C. The Center's Memorandum in Support of Injunctive Relief

The Center seeks equitable relief on behalf of the residents in Defendants' communities. Once a court finds that a defendant has discriminated against tenants or prospective tenants, it "may" enjoin the defendant from engaging in such practices.  42 U.S.C § 3163(c)(1).  The purpose of such injunctive relief is to ensure that the FHA is not violated in the future and to remove any lingering effects of past discrimination.  *See Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir. 1983).  Any injunctive relief "must be tailored in each instance to the needs of the particular situation, a matter peculiarly within the discretion of the district judge."  *Id.*

Here, the Court exercises its discretion by declining to issue any injunction for several reasons.  First, the Court concludes that while the text of certain rules in this case published by Defendants was facially discriminatory against families, the Court was persuaded at trial that the purpose and intent of those rules was not to discriminate.  Instead, the Court concludes that the purpose and intent of those rules was the safety and protection of all residents—including children—in a dangerous, troubled neighborhood during a particularly dangerous time.  The Court also concludes that the rules were successful insofar as through a number of reforms, including the rules, the Defendant communities succeeded in improving the quality of life and conditions for all residents, including children.

Second, the Court concludes that the Loitering Rule and Curfew Rule were sufficiently enforced as to all residents, not just children.  To the extent those rules were not applied to adults in certain contexts, such as returning home from the work at night, the Court concludes that the rules would not have been enforced against a similarly-situated child as well.

Third, other potential relevant factors for this Court's equitable consideration weigh in favor of Defendants:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also United States v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 756 (S.D. Oh. 2007) ("[N]o provision of the FHA demonstrates that Congress intended to allow a permanent injunction to be granted in the absence of

consideration of the [above quoted] equitable factors.").  The first two equitable factors quoted above weigh heavily in favor of Defendants by virtue of the jury's verdict.  The fourth factor may also weigh in favor of Defendants insofar as a court-issued injunction punishing Defendants could undermine the public trust in the jury system after a jury verdict was reached wholly absolving Defendants of liability.

Fourth, to the extent Defendants' rules facially discriminated against children and facially violated the FHA, Defendants have been adequately chastised in the form of a long, protracted, and costly lawsuit.  Although Defendants ultimately prevailed at trial, Defendants paid a heavy price to do so.  Defendants are well aware that the language utilized in their rules was the genesis of this case, and they are now adequately on notice to carefully consider the text of any similar rules in the future.  Thus, for all of the foregoing reasons, the Court concludes that an injunction is unnecessary to remove any lingering effects of past discrimination and an injunction is unnecessary to ensure that the FHA is not violated in the future.  The Court has other grounds for its decision not to issue an injunction as well.

Fifth and in the alternative, the jury's verdict precludes injunctive relief.  Here, the jury found no Plaintiff to be entitled to damages and no Defendant to be liable.  To be clear, the jury did *not* find that a Defendant was liable and owed zero damages—the jury found no liability whatsoever.  When legal and equitable issues are tried together and overlap factually, the Seventh Amendment requires that "all findings necessarily made by the jury in awarding [a] verdict to [a] party on legal claims] are binding on . . . the trial court" when it sits in equity.  *Brown v. Ala. Dep't of Trans.*, 597 F.3d 1160, 1184 (11th Cir. 2010) (quoting *Williams v. City of Valdosta*, 689 F.2d 964, 976 (11th Cir. 1982)).  Although the Center cites to two cases where a court exercised

equitable powers after a jury found in favor of a defendant, those cases are distinguishable because in both cases the jury concluded that defendants were partially liable—the defendants were not wholly absolved. *See Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp. 2d 1303, 1308 (S.D. Fla. 2004); *Cabrera v. Fischler*, 814 F. Supp. 269, 273 (E.D.N.Y. 1993) ("By these findings, the jury held the landlord-defendants liable for the discriminatory acts of their agent."). Thus, because the jury found no Defendant in the instant case to be liable under the FHA, any equitable remedy by this Court that "removed any lingering effects of past discrimination" would be incompatible with the jury's findings. Similarly, it is difficult to envision why this Court should issue an injunction to "ensure the FHA is not violated in the future" after Defendants were completely vindicated of all liability under the FHA in the past.

Sixth and in the alternative, to the extent the legal and equitable issues in this case do not overlap and the jury's verdict is not dispositive of this Court's equitable powers,[14] the jury's verdict on equitable issues is advisory. *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1529 n.4 (11th Cir. 1990). In the event the jury's verdict is advisory, the Court finds that (i) the verdict is persuasive and (ii) equitable relief is therefore unnecessary.

Seventh and in the alternative, the Center no longer possesses sufficient standing to request equitable relief. To the extent the Center brought its equitable claims on its own behalf, the jury found by virtue of its verdict that the Center has not been damaged in any way. To the extent the Center brought its equitable claims in a representative capacity for other residents in the Defendant communities:

---

14 For example, the jury's verdict could be considered to not overlap with the Court's prior finding that the Loitering Rule and Curfew Rule violated the FHA and, as a result, the verdict may merely be advisory with respect to whether injunction should issue to prevent FHA violations in the future in connection with Defendants' decisions to publish the aforementioned rules in the past.

> The association must allege that its members, or any one of them, are suffering immediate threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. **So long as this can be established** . . . the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added).  By virtue of the jury's verdict, the Center can no longer establish that any resident of the community is threatened with immediate injury.  Thus, the Center lacks standing to even pursue its equitable claims.

Eighth and finally, the Court notes that the equitable relief sought by the Center, when juxtaposed to the jury's verdict in this case, is not justified.  When a court hears equitable claims in conjunction with claims heard by a jury, the judge's findings must be consistent with the jury's verdict.  *See, e.g.*, *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1048 (2d Cir .1992); *In re Lewis*, 845 F.2d 624, 628-30 (6th Cir. 1988); *Troy v. Bay State Computer Grp.*, No. 92-12267, 1997 WL 102498, at *2 (D. Mass. Mar. 4, 1997).  With the requirement for consistency in mind, the Court summarizes the equitable relief sought by the Center:

> The [Center] seeks one year's rent for the 400 families with children, which is necessary to get the 400 families the value of their bargain in their rentals.
>
> . . .
>
> The [Center] seeks for the Court to order a compliance and testing program . . . [that] would include random testing over three years.
>
> . . .
>
> The [Center] seeks an order requiring Defendants to submit all occupancy application denials from 2012 to the present and to do so for an additional two years.
>
> . . .

> The [Center] seeks a court order requiring the [Defendants] to create new public places where children of all ages can congregate and play subject to Court approval.
>
> . . .
>
> The [Center] seeks a Court order requiring the [Defendants] to make available counseling in a form and manner approved by the Court to the impacted children for a period of two years.

DE 457 at 12-14, 20. The Center also seeks an order from the Court that essentially orders the Defendant homeowner associations to terminate their existing leadership. *Id.* at 15. The inconsistency between the Center's requested relief and the jury's verdict is abundantly evident.

For all of the foregoing reasons, Plaintiffs' claims for equitable relief are all **DENIED**.

### D. The Center's Motion for Judgment as a Matter of Law

The Center argues that judgment should be entered as a matter of law against the Defendant property managers because "there is no legally sufficient basis to conclude other than the Property Managers are liable for enforcing the unlawful Curfew and Loitering Rules" because "the Court previously ruled that the Curfew and Loitering Rules . . . violate the Fair Housing Act." DE 461 at 2. Pursuant to Federal Rule of Civil Procedure 50(b):

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> **(1)** allow judgment on the verdict, if the jury returned a verdict;
> **(2)** order a new trial; or
> **(3)** direct the entry of judgment as a matter of law.

> While it is true that "[w]hen a court considers a motion for judgment as a matter of

law—even after the jury has rendered a verdict—only the sufficiency of the evidence matters" and "[t]he jury's findings are irrelevant," the Court has already concluded above that the jury's verdict was supported by sufficient evidence. *Connelly v. Metro. Atl. Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014). As before, the Center ignores the element of causation. With respect to the individual Plaintiffs and the enforcement of the rules in connection therewith, the jury had sufficient evidence upon which to reach the conclusion that the rules were not enforced in a discriminatory manner or otherwise did not cause any Plaintiff damages. For example, as quoted in part in Section II.B.1, evidence was admitted that questioned whether rules were enforced and evidence was admitted that the rules were enforced in a manner that did not discriminate against families or children. In summary, the jury's decision was supported by sufficient evidence and, moreover, the jury was free to disregard and assign no credibility to Plaintiffs' evidence on causation and damages. The jury's verdict should stand. The Center's Motion for Judgment as a Matter of Law is **DENIED**.

### E. Defendant Emmanuel Management's Motion for Judgment

Defendant Emmanuel Management has moved for the Court to enter final judgment in its favor. To the extent the Center's other filings (discussed above) may be construed as opposition to Emmanuel Management's motion, those arguments are unpersuasive for all of the reasons previously stated. Emmanuel Management was wholly vindicated by the jury and the jury's verdict should stand. Emmanuel Management's Motion for Entry of Final Judgment is **GRANTED**. Final judgment will be entered separately.

### III.   CONCLUSION

For all of the foregoing reasons, the Court concludes (i) that the jury's verdict was

supported by substantial and sufficient evidence, (ii) the jury's verdict was not against the clear weight of evidence, (iii) the jury's verdict did not result in a manifest injustice, (iv) no equitable remedy is warranted in this case, (v) judgment as a matter of law in favor of any Plaintiff is denied, and (vi) Defendant Emmanuel Management is entitled to entry of final judgment.  It is therefore **ORDERED AND ADJUDGED** that the Center's Motion for a New Trial Limited to Diversion of Resources and Frustration of Mission [DE 460] is **DENIED**, Plaintiffs' claims for equitable relief are all **DENIED**, the Center's Motion for Judgment as a Matter of Law [DE 461] is **DENIED**, and Defendant Emmanuel Management's Motion for Judgment [DE 459] is **GRANTED**.

　　　　**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 24th day of February, 2016.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record